41 P.3d 1240 (2002)
STATE of Washington, Respondent,
v.
Stanley Leonard PIETRZAK, Appellant.
No. 19694-1-III.
Court of Appeals of Washington, Division 3, Panel Three.
March 12, 2002.
*1241 David N. Gasch, Spokane, for Appellant.
Kevin M. Korsmo, Deputy Prosecuting Attorney, Spokane, for Respondent.

OPINION PUBLISHED IN PART
BROWN, A.C.J.
After his conviction in a newsworthy trial for first degree murder, Stanley L. Pietrzak, received an exceptional sentence. In the published part of this opinion, we hold for the first time that a defendant's pre-crime statements can corroborate post-crime statements for purposes of establishing corpus delicti. On that basis and others discussed in the unpublished portion of this opinion, we affirm.

FACTS
Kelly Conway, a developmentally disabled resident in the same apartment building as Mr. Pietrzak, disappeared in November 1998. In April 1999, acting on a tip, police searched the building's basement and found a piece of her scalp with attached hair hanging from a gas line and her bones inside the firebox of an old furnace. In August 1999, Mr. Pietrzak was charged with Ms. Conway's first degree murder.
In January 2000, Mr. Pietrzak moved to close the evidence suppression hearings. The State and a local newspaper reporter opposed closure. The trial court reasoned less restrictive alternatives to closure could be employed to balance the public's First Amendment right to press coverage and Mr. Pietrzak's Sixth Amendment right to a fair trial. In written findings, the trial court detailed it would delay document filings and related hearings until after jury selection, call a larger panel of prospective jurors, employ confidential questionnaires, individually interview jurors with counsel, use extra alternates, *1242 and constantly admonish the jury to avoid media coverage.
In April 2000, the trial court first addressed issues relating to the expert opinion of Dr. George Lindholm, a forensic pathologist and medical examiner; it ruled admissible his opinion that Ms. Conway's death was with reasonable medical certainty a homicide in manner, even though he could not state a cause. Jury selection began August 7, 2000, and concluded August 9. Then, following delayed pretrial motions, opening statements. Evidence began on August 14 and concluded August 22, surrounded by extensive publicity due to allegations of dismemberment, cannibalism, and other deaths.
On the first day of jury selection, the trial court admonished a large panel of 60 prospective jurors of the potential for media coverage, and not to read, view, or listen to any media coverage throughout the trial. Over 40 jurors indicated prior knowledge of the case. Jurors were interviewed individually outside the presence of the other jurors. Publicity concerns were discussed. Jurors with significant knowledge, or knowing inadmissible subjects, or indicating inappropriate views on Mr. Pietrzak's guilt or innocence were excused. Neither party used all available peremptory challenges.
Immediately after jury selection, the trial court admonished the jury:
Do not read, view or listen to any report from the newspaper, radio, TV, Internet, wire service or any other electronic media with respect to this trial. Do not permit anyone to read or comment on it to you or in your presence. If at any time along the way you do come in contact with any information from an outside source, please advise the bailiff and she will advise the Court.
Report of Proceedings (RP at 632-33).
Mr. Pietrzak moved unsuccessfully to sequester the jury. The trial court then, very specifically, instructed the jury about sequestration and the importance of heeding its admonitions against media contact for the duration of the trial, to include reporting breaches to the bailiff. Further:
Do not read, view or listen to any report from the newspapers, radio, television, any sorts of electronic media on the subject of this trial. Do not permit anyone to read or comment on it to you or in your presence. Now the Court is broadening this instruction to include reading the newspaper, not just an article on this case, but reading the newspaper, watching television, listening to the radio, surfing the internet news or any other electronic media source or any other manner of exposure to the media.
RP at 746.
At the start of each following morning of trial, the trial court confirmed jury compliance with its publicity instructions and again instructed against media exposure and case discussions. At the close of sessions, the trial court again similarly instructed the jury. The gallery was told periodically not to discuss the matter in the courtroom or hallways because of the risk that the jury might hear such discussions.
In the delayed suppression hearings after jury selection, the trial court excluded Mr. Pietrzak's statements to others indicating his possible cannibalism of Ms. Conway, evidence linking Mr. Pietrzak to prior deaths, and his prior convictions. The trial court again denied Mr. Pietrzak's renewed motion to exclude Dr. George Lindholm's homicide opinion. Finally, the trial court denied sequestration.
Just before opening statements, Mr. Pietrzak moved for a mistrial mainly on the basis of excessive publicity regarding the excluded evidence. After reviewing videotapes and news clippings, the jury selection process, and the instructions already given and to be given throughout the trial, the trial court denied the motion.
The State's case in chief included more than 20 witnesses. Dr. Sarah Keller, an anthropologist, testified she examined material removed from the furnace and found *1243 1,350 pieces of human bone coming from one adult female between 18 to 30 years of age. Dr. Keller found cut marks on the cervical vertebra consistent with the absence of skull fragments. She also found small zigzag cut marks on two long bones, probably femurs. Dr. Keller determined the cut marks on the cervical vertebra occurred "mighty close to death," before or after. RP at 978.
Kevin Jenkins, a forensic scientist, examined the hair removed from the gas line and determined it had been removed after death. Another forensic scientist, Ray Pellegrin, through DNA testing, connected the hair to Ms. Conway.
Mr. Pietrzak again unsuccessfully objected to Dr. Lindholm's homicide opinion. The doctor could not determine the "cause" of death, but could, with reasonable medical certainty, determine the manner of death as homicide. Dr. Lindholm explained his opinion was based upon, "[t]he circumstances of the recovery of the remains [burned in a basement furnace] and the absence of certain components of the body [head and hands], are, if you like, strong indication that this is a homicide." RP at 1032. Dr. Lindholm added the age, the attempt to obscure identity, and implement markings indicating an attempt to dismember the body as supporting factors.
Ron Tweedy testified Mr. Pietrzak said he wanted to kill Ms. Conway. Clare Seale testified Mr. Pietrzak said he wished Ms. Conway was dead. Ms. Seale also said Mr. Pietrzak told her it would be easy to kill someone and dispose of the body in the furnace. Ms. Seale also recalled telling a detective that Mr. Pietrzak told her the easiest way to get rid of someone was to dismember them and burn the remains in the furnace.
Eric Westerlund testified Mr. Pietrzak would get upset at Ms. Conway for raiding his refrigerator and talked about killing her. Mr. Pietrzak was upset because Ms. Conway would not sleep with him. After Ms. Conway's disappearance, Mr. Westerlund found bones in the furnace.
Jody West testified Mr. Pietrzak told her after Ms. Conway's disappearance that "she was gone for good," which Ms. West understood at the time to mean Ms. Conway had moved out of town. RP at 1162. Later, Mr. Pietrzak told Ms. West he had killed Ms. Conway. A third time, Mr. Pietrzak told Ms. West he had strangled Ms. Conway, dismembered her body, and put her in the furnace. Prior to Ms. Conway's disappearance, Mr. Pietrzak told Ms. West the furnace was an easy way to hide a body.
Stephen Akre testified Mr. Pietrzak told him he had killed Ms. Conway and offered to show him her remains. Later, Mr. Pietrzak again said he killed Ms. Conway and remorsefully stated, "`I can't believe I killed her.'" RP at 1182.
Melanie Wilson testified Mr. Pietrzak told her after Ms. Conway's disappearance that she "was gone for good." RP at 1189. Shannon Christensen testified Mr. Pietrzak repeatedly stated he had killed Ms. Conway and put her body in the furnace.
Jennifer Waltering testified Mr. Pietrzak was in love with her, although Ms. Waltering already had a boyfriend. She loved Mr. Pietrzak like a brother, and would visit his apartment on a regular basis. Ms. Waltering said she was a protective "street mother" to Ms. Conway. RP at 1201-02.
One night in November 1998, Ms. Waltering, her boyfriend, Jeff Curran, and Mr. Pietrzak were watching movies in Mr. Pietrzak's apartment. Ms. Conway arrived later complaining of back pain, drank some beer, and asked Mr. Pietrzak to give her a full body massage. According to Ms. Waltering, Mr. Pietrzak gave Ms. Conway muscle relaxants and then gave her a massage while Ms. Waltering looked on. Eventually, Ms. Waltering and Mr. Curran left while Ms. Conway remained in Mr. Pietrzak's bedroom "kind of out of it." RP at 1210. Ms. Waltering never saw Ms. Conway again.
Mr. Curran testified he last saw Ms. Conway in Mr. Pietrzak's apartment, as did Ms. Waltering. He saw Mr. Pietrzak give Ms. *1244 Conway a muscle relaxant that she washed down with alcohol. Ms. Conway said she was going to take a bus to Seattle the next day. When Mr. Curran and Ms. Waltering left, Ms. Conway was sleeping in Mr. Pietrzak's bedroom while Mr. Pietrzak slept in a reclining chair nearby.
About a month later, Mr. Pietrzak told Mr. Curran that he had killed Ms. Conway. Before her disappearance, Mr. Pietrzak had said, "she was better off dead." RP at 1263. Mr. Pietrzak specifically told Mr. Curran he had killed, dismembered, and put Ms. Conway in the furnace. Mr. Pietrzak indicated nonverbally he had strangled her. Mr. Curran later saw bones in the furnace.
Michael Naron testified he did not know Ms. Conway. Mr. Pietrzak told him several times he had slept with Ms. Conway, killed her, and put her body in the furnace.
After the State rested and four defense witnesses testified, and in apparent anticipation of Mr. Pietrzak's upcoming cross-examination, the State moved to admit evidence of two earlier deaths linked to Mr. Pietrzak. These related to: Karen Marie Pietrzak, who died in Mr. Pietrzak's bed in 1976; and Allison Weaver, who died in Mr. Pietrzak's bed in May 1998. Dr. Lindholm testified he conducted an autopsy on Ms. Weaver and found evidence of alcohol, cocaine, and legal drugs in her bloodstream, but he could not determine the cause or manner of death. Dr. Lindholm's testimony suggested Mrs. Pietrzak's death was similar to Ms. Weaver's circumstances.
While not used as an underlying basis for his homicide opinion to the jury, Dr. Lindholm related the prior deaths further supported his opinion. He stressed Mr. Pietrzak went through two prior death investigations and when faced with a third investigation, found it necessary to conceal the identity of Ms. Conway. Asked how the prior deaths factored into his jury testimony, Dr. Lindholm acknowledged the deaths as a factor he was aware of when giving his opinion to the jury, but specified the prior deaths were disregarded: "I have to sort of disregard them because they're not an issue in this case, but they further bolster and augment the fact that I believe it's a homicide." RP at 1350-51. Mr. Pietrzak's reluctance to come forward was, however, a further basis supporting Dr. Lindholm's homicide opinion.
The trial court ruled the evidence of prior deaths inadmissible for any purpose and recessed. The next morning, the defense unsuccessfully moved to dismiss for insufficient evidence of corpus delicti, then presented Mr. Pietrzak as its final witness.
Mr. Pietrzak denied killing Ms. Conway. Mr. Pietrzak related he had received sedatives intended for another apartment resident, but gave some of them to Ms. Waltering who later gave some to Ms. Conway on the night she died. He went to bed next to Ms. Conway and found her dead when he woke up. Mr. Pietrzak described his panic, feeling personally responsible because he had given the pills to Ms. Waltering in the first place, and protective toward Ms. Waltering because he loved her. These factors motivated him to take Ms. Conway's body to the basement where he removed her head and hands with a serrated knife. Then he placed the head and hands in a garbage sack that he dumped into a passing garbage truck. Later, he burned the rest of body in the furnace. Mr. Pietrzak admitted telling various people he killed Ms. Conway, but explained he did so out of a combined sense of responsibility for her overdose death and his desire to deflect blame away from Ms. Waltering.
The jury returned a guilty verdict, as charged. Mr. Pietrzak unsuccessfully moved for a new trial based on excessive publicity. At the State's request, the trial court imposed an exceptional sentence of 480 months based upon grounds of vulnerability and concealment. The trial court noted it would have imposed an exceptional sentence on the basis of one of the factors alone. Mr. Pietrzak appealed.

ANALYSIS
A. Corpus Delicti Evidence
The issue is whether sufficient evidence exists to establish the corpus delicti of homicide. *1245 A matter of first impression is whether Mr. Pietrzak's pre-crime statements can be considered in the corpus delicti analysis.
"`Corpus delicti' literally means `body of the crime.'" State v. Aten, 130 Wash.2d 640, 655, 927 P.2d 210 (1996) (quoting 1 McCormick on Evidence § 145 at 227 (John W. Strong ed., 4th ed.1992)). "In a homicide case, the corpus delicti consists of two elements the State must prove at trial: (1) the fact of death and (2) a causal connection between the death and a criminal act." Aten, 130 Wash.2d at 655, 927 P.2d 210 (citing State v. Lung, 70 Wash.2d 365, 371, 423 P.2d 72 (1967)). The fact of Ms. Conway's death is not an issue.
In Washington, the defendant's confessions or admissions are insufficient, standing alone, to establish corpus delicti absent independent evidence. Aten, 130 Wash.2d at 655-56, 927 P.2d 210. The independent evidence need not be sufficient to support conviction or to even send the case to the jury. Id. at 656, 927 P.2d 210. But the evidence must be sufficient to support a logical and reasonable inference of the facts to be proved at trial. Id. "When determining whether the corpus delicti was established, this court `assumes the truth of the State's evidence and all reasonable inferences from it in a light most favorable to the State.'" State v. Ray, 130 Wash.2d 673, 679, 926 P.2d 904 (1996) (quoting Aten, 130 Wash.2d at 658, 927 P.2d 210). The State can prove corpus delicti by either direct or circumstantial evidence. Aten, 130 Wash.2d at 655, 927 P.2d 210.
The State contends Mr. Pietrzak waived the corpus delicti issue by raising it late. Mr. Pietrzak moved to dismiss on corpus delicti grounds partway through his defense and just before he testified on his own behalf. The State knew of the general concern at least by the April hearings and did have the opportunity to present rebuttal evidence.
The State treats its corpus delicti challenge as though it was purely a rule of evidence. Cf. State v. C.D.W., 76 Wash.App. 761, 763-64, 887 P.2d 911 (1995) (holding corpus delicti rule is a rule of evidence that cannot be raised for the first time on appeal). However, "The corpus delicti rule was established to protect a defendant from the possibility of an unjust conviction based upon a false confession alone." State v. Vangerpen, 125 Wash.2d 782, 796, 888 P.2d 1177 (1995) (citing City of Bremerton v. Corbett, 106 Wash.2d 569, 576, 723 P.2d 1135 (1986)).
We have not been cited authority, nor can we find any requiring a defendant to raise a corpus delicti challenge during the State's case in chief. See Aten, 130 Wash.2d at 654, 927 P.2d 210 (defendant raised corpus delicti challenge after close of State's case in chief). And the Supreme Court has addressed corpus delicti arguments raised for the first time on appeal. See Vangerpen, 125 Wash.2d at 795-96, 888 P.2d 1177; State v. Riley, 121 Wash.2d 22, 31-32, 846 P.2d 1365 (1993).
Generally, when a defendant elects to introduce substantive evidence on his or her own behalf following denial of a corpus delicti motion, the defendant waives his or her challenge to the sufficiency of the evidence as it stood at that point. State v. Liles-Heide, 94 Wash.App. 569, 572, 970 P.2d 349 (1999). "The appellant court then may review the evidence as a whole to determine whether there is sufficient independent evidence supporting a logical and reasonable inference that the crime charged occurred." Id. (citing State v. Dodgen, 81 Wash.App. 487, 489, 915 P.2d 531 (1996)). In other words, once the defendant elects to present evidence and that evidence establishes the corpus delicti, he or she cannot prevail on appeal. Liles-Heide, 94 Wash.App. at 572-73, 970 P.2d 349.
Additionally, statements made by the defendant in the course of a crime are not confessions or post-crime statements requiring corroboration for purposes of corpus delicti. State v. Dyson, 91 Wash.App. 761, 763, 959 P.2d 1138 (1998). Other jurisdictions *1246 have also held that pre-crime statements need not be corroborated as well. See, e.g., Warszower v. United States, 312 U.S. 342, 347, 61 S.Ct. 603, 85 L.Ed. 876 (1941); Castillo v. State, 614 P.2d 756, 759 (Alaska 1980); State v. Johnson, 821 P.2d 1150, 1162-63 (Utah 1991). As the United States Supreme Court noted:
The rule requiring corroboration of confessions protects the administration of the criminal law against errors in convictions based upon untrue confessions alone. Where the inconsistent statement was made prior to the crime this danger does not exist. Therefore we are of the view that such admissions do not need to be corroborated. They contain none of the inherent weaknesses of confessions or admissions after the fact.
Warszower, 312 U.S. at 347, 61 S.Ct. 603.
We conclude the foregoing reasoning is persuasive and adopt a rule that pre-crime statements can corroborate post-crime statements for purposes of establishing corpus delicti.
Applying this rule, independent evidence shows Mr. Pietrzak told people prior to Ms. Conway's disappearance he disliked her and wanted to kill her. Castillo, 614 P.2d at 759; Johnson, 821 P.2d at 1162-63. Ms. Conway was at Mr. Pietrzak's apartment the night before she disappeared. There, Ms. Conway was given drugs. She was last seen alive in Mr. Pietrzak's bed in a stupor. Ms. Conway's burned remains were discovered in a furnace that Mr. Pietrzak had access to, and had referred to as a means of disposing of a body before Ms. Conway's disappearance. Body parts had been removed and discarded separately, apparently to hide her identity. The knife marks on Ms. Conway's remains were inflicted "mighty close to death," before or after. RP at 978.
Interpreting the evidence in a light most favorable to the State, as we must, the foregoing evidence raises a logical and reasonable inference that a criminal act caused Ms. Conway's death. Thus, corroboration exists for Mr. Pietrzak's admissions of guilt. See Lung, 70 Wash.2d at 372-73, 423 P.2d 72; State v. Quillin, 49 Wash.App. 155, 162-64, 741 P.2d 589 (1987). Accordingly, we conclude the evidence established the corpus delicti.
Affirmed.
A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder, having no precedential value, shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
WE CONCUR: SWEENEY and SCHULTHEIS, JJ.