2016 MAR 14 AM 9: 14


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72055-4-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| IRA DAVID DECHANT, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 14, 2016 |
| | ) | |

LEACH, J. — Ira Dechant appeals multiple convictions stemming from his January 2013 arrest and his role in a subsequent plot to kill the man he believed to be responsible for his arrest. He claims that the corpus delicti rule requires independent proof to corroborate statements he made during the course of the crimes of conspiracy, solicitation, and attempted murder. He also contends that his trial counsel provided ineffective representation because he did not file a motion to suppress evidence and that his multiple convictions based upon a single plot to kill subject him to double jeopardy. Because Dechant's statements made during the course of the crimes were not confessions, the corpus delicti rule does not apply. He also fails to establish deficient conduct or prejudice, and his convictions do not violate double jeopardy. Finally, none of the issues he raises in his statement of additional grounds has merit. We affirm.

FACTS

On January 7, 2013, Seattle Police Officer Pete Lazarou received a tip from a longstanding confidential informant, Louis Didomenici. Didomenici told Officer Lazarou that Ira Dechant had an outstanding warrant and possessed firearms. Didomenici also told the officer that Dechant was driving a BMW in the Ravenna neighborhood. In addition to being an informant, Didomenici worked as an automobile broker and had loaned Dechant the BMW several days earlier.

Officer Lazarou confirmed the outstanding warrant for Dechant's arrest. With help from other officers, Officer Lazarou located and stopped the vehicle Didomenici described. The officers arrested Dechant on the warrant. Dechant told the officers he did not own the BMW and provided Didomenici's phone number. Officer Lazarou called Didomenici. He came to the scene with the vehicle's registered owner. Both consented to a search of the vehicle. During the search, the police found several items, including two firearms, a police tactical vest, a security badge, a King County Sheriff's Office patch, hypodermic needles, and over $10,000 in cash.

Police officers booked Dechant into the King County jail. While conducting a strip search, the police found baggies containing methamphetamine and heroin.

While in jail, Dechant met Michael Rogers, who had been arrested in connection with a bank robbery. Rogers and Dechant, who had both served substantial time in custody, eventually shared a jail cell. Sitting at a card table one day with Rogers and several others, Dechant expressed his anger at the person who "set him up" and asked if anyone would be "willing to take care of the guy."

Rogers was interested in the proposal. In later private conversations, Dechant provided more details, including Didomenici's name and occupation. Dechant drew a map showing where Didomenici lived. Dechant gave instructions about how he wanted Rogers to kill Didomenici—he wanted him to pour gasoline over Didomenici and set him on fire or, alternatively, he wanted Rogers to shoot him and cut off his head and hands. Dechant told Rogers that his "prodigy," Chuck, would provide anything Rogers needed, including a firearm and money, in order to kill Didomenici. Dechant gave Rogers Chuck's address and drew him a map to Chuck's house. Rogers asked for $8,000, but they did not ultimately settle on a fixed price. Dechant provided some information to Rogers to enable him to commit identity thefts and raise money for Dechant's bail. They discussed a plan to commit robberies together to raise funds once they were both released from jail.

Gradually, Rogers developed some reservations about the plan. He began to feel manipulated by Dechant and also discovered that Didomenici had children. When jail authorities placed Dechant in isolation, Rogers reported the plot to jail staff. Rogers said he believed that if he refused to carry out the plan, Dechant would merely find someone else to do it.

Rogers met with a detective and agreed to ask Dechant about the plan while wearing a recording device. In a recorded conversation, Dechant confirmed that Chuck would provide Rogers with a "piece." He also gave Rogers further instructions about when to go to Didomenici's residence and about moving his dead body to a certain abandoned house.

While in jail, Dechant called Charles Scheulke, the man he called "Chuck." Scheulke met Dechant about a month before his January 2013 arrest. They robbed people and sold drugs together. During the robberies, Scheulke and Dechant disguised themselves as police officers, and both carried firearms.

In their conversations, Dechant expressed anger about the "car salesman" who "set [him] up" and asked Scheulke to visit him in person. Dechant also informed Scheulke about a fellow inmate who would be released from jail soon and then contact him. Dechant described Rogers' distinctive tattoo so that Scheulke would be able to identify him.

Scheulke also visited Dechant in jail. He brought a notebook and took notes. They discussed Didomenici's betrayal. Dechant instructed Scheulke to provide Rogers with "anything that he needs." Dechant made it specifically clear that Scheulke was to provide Rogers with a gun.

On January 29, 2013, jail authorities released Rogers into the custody of the investigating detective. Just before his release, Rogers told Dechant that Rogers' father was going to post his bail. Under police surveillance, Rogers went to Scheulke's home. According to Scheulke, at this point he became aware that Rogers intended to kill Didomenici. Scheulke provided Rogers with a firearm and agreed to go with him to Didomenici's residence. En route to Didomenici's home, Rogers gave a prearranged signal to the police to indicate that Scheulke had given him a firearm. Police officers then stopped and arrested Rogers and Scheulke.

The State charged Dechant with unlawful possession of a firearm in the second degree and possession of heroin based upon the evidence found when he was arrested on January 7, 2013. The State also charged Dechant with solicitation to commit murder in the first degree, conspiracy to commit murder in the first degree, and attempted murder in the first degree based on the plot to murder Didomenici.

The State originally charged Scheulke with attempted first degree murder and conspiracy to commit first degree murder. He pleaded guilty to a reduced charge in exchange for his agreement to testify at Dechant's trial. Rogers also testified at trial. In exchange, the State reduced his underlying bank robbery charge and allowed him to plead guilty to rendering criminal assistance.

Although the State presented all the evidence in a single trial before a jury, Dechant waived his right to a jury on the firearm and drug charges. The jury and the trial court found Dechant guilty as charged.

## CORPUS DELICTI

Dechant challenges the sufficiency of the evidence supporting his convictions related to the plot to murder Didomenici. Specifically, he argues, for the first time on appeal, that the State failed to prove the corpus delicti of solicitation, conspiracy, and attempted murder independent of his incriminating out-of-court statements. We review this issue de novo.[1]

"Corpus delicti" means the "body of the crime" and requires the State to prove both a criminal act and a resulting loss.[2] "The corpus delicti rule was established to protect a defendant from the possibility of an unjust conviction based upon a false confession alone."[3]

---

[1] State v. McPhee, 156 Wn. App. 44, 60, 230 P.3d 284 (2010); State v. Pineda, 99 Wn. App. 65, 76-77, 992 P.2d 525 (2000).
[2] See State v. Aten, 130 Wn.2d 640, 655, 927 P.2d 210 (1996).
[3] State v. Vangerpen, 125 Wn.2d 782, 796, 888 P.2d 1177 (1995).

Dechant's argument assumes that the incriminating statements he made to Rogers and Scheulke were confessions. We disagree. These statements constituted part of the crimes. Dechant did not admit guilt relating to any past completed crimes. While Dechant argues at length that the corpus delicti doctrine applies to this case, he cites no legal authority supporting the position that statements made during the course of a crime or statements that constitute a criminal act are confessions and, thus, require independent corroboration. And this court has explicitly refused to apply the corpus delicti rule to exclude statements made before or during the commission of a crime.[4]

In State v. Dyson,[5] we rejected the defendant's argument that his statements comprising negotiation and agreement for an act of prostitution were inadmissible because they were not corroborated by independent proof. We looked to the definition of a "confession" as an "expression of guilt as to a past act."[6] We held the corpus delicti rule did not apply because Dyson's statements were a part of the crime itself and not a confession to a completed crime.[7]

---

[4] See State v. Dyson, 91 Wn. App. 761, 763-64, 959 P.2d 1138 (1998); see also State v. Pietrzak, 110 Wn. App. 670, 681-82, 41 P.3d 1240, review denied, 147 Wn.2d 1013 (2002).

[5] 91 Wn. App. 761, 763, 959 P.2d 1138 (1998).

[6] Dyson, 91 Wn. App. at 763.

[7] Dyson, 91 Wn. App. at 763-64.

Also, in State v. Pietrzak,[8] the State presented evidence that Pietrzak told people that he disliked the victim, Kelly Conway, and wanted to kill her. After Pietrzak made these statements, Conway disappeared.[9] Following the disappearance, Pietrzak admitted to others that he killed the victim.[10] On appeal, Pietrzak challenged the sufficiency of the evidence to establish the corpus delicti of the crime.[11] Division Three of this court held that Pietrzak's precrime incriminating statements were not confessions and, therefore, did not require independent corroboration.[12]

Similarly, Dechant's statements to Rogers and Scheulke were part of the crimes of solicitation, conspiracy, and attempted murder. Because Dechant never "expressed guilt" at a later date about these acts, no confession occurred. The corpus delicti rule does not apply.

## DOUBLE JEOPARDY

Dechant also challenges his convictions of solicitation to commit murder in the first degree, conspiracy to commit murder in the first degree, and attempted murder in the first degree on double jeopardy grounds.

---

[8] 110 Wn. App. 670, 675-76, 41 P.3d 1240, review denied, 147 Wn.2d 1013 (2002).

[9] Pietrzak, 110 Wn. App. at 672, 675.

[10] Pietrzak, 110 Wn. App. at 676.

[11] Pietrzak, 110 Wn. App. at 679.

[12] Pietrzak, 110 Wn. App. at 680-81.

The double jeopardy clauses of the state and federal constitutions protect a defendant against multiple punishments for the same offense.[13] Although the State may bring multiple charges arising from the same criminal conduct when a defendant's conduct supports charges under multiple criminal statutes, to evaluate a double jeopardy challenge, a court must determine if, in light of legislative intent, the charged crimes constitute the same offense.[14] "If the legislature authorized cumulative punishments for both crimes, then double jeopardy is not offended."[15]

If the statutory language does not clearly authorize multiple punishments, the court must consider principles of statutory construction.[16] Then, the test "to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."[17] "'If there is an element in each offense which is not included in the other, and proof of one offense would not necessarily also prove the other, the offenses are not constitutionally the

---

[13] U.S. CONST. amend. V; WASH. CONST. art. I, § 9; State v. Calle, 125 Wn.2d 769, 772, 888 P.2d 155 (1995).

[14] State v. Freeman, 153 Wn.2d 765, 771, 108 P.3d 753 (2005).

[15] Freeman, 153 Wn.2d at 771.

[16] In re Pers. Restraint of Borrero, 161 Wn.2d 532, 536, 167 P.3d 1106 (2007).

[17] Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

same and the double jeopardy clause does not prevent convictions for both offenses.'"[18]

Where, as here, one of the two crimes is an attempt crime, "the test requires further refinement."[19] This is because one of the elements of an attempt crime is "'any act which is a substantial step toward the commission of that crime.'"[20] This "substantial step" element is merely a placeholder until the facts of the particular case give it independent meaning.[21] Therefore, to determine if the two convictions violate double jeopardy, we examine the actual facts that constitute the substantial step.[22]

But even when the same facts supporting the defendant's conviction for the separate offense could also constitute the substantial step of the attempt, no double jeopardy violation occurs if the record includes additional facts that would also constitute the substantial step.[23] The reviewing court should not presume "that the trier of fact relied on only the facts tending to prove both crimes."[24] Unless the facts providing the basis for the separate conviction are also

---

[18] Calle, 125 Wn.2d at 777 (quoting State v. Vladovic, 99 Wn.2d 413, 423, 662 P.2d 853 (1983)).
[19] Borrero, 161 Wn.2d at 537.
[20] Borrero, 161 Wn.2d at 537 (quoting RCW 9A.28.020(1)).
[21] Borrero, 161 Wn.2d at 537.
[22] Borrero, 161 Wn.2d at 537.
[23] Borrero, 161 Wn.2d at 538.
[24] Borrero, 161 Wn.2d at 538.

necessary to prove the attempt crime, double jeopardy principles are not offended.[25]

As the State points out, the crimes at issue include different legal elements and each requires proof of a fact that the others do not. To prove the crime of solicitation to commit murder in the first degree, the State was required to demonstrate that Dechant offered to give money or some other thing of value to another to engage in conduct constituting first degree murder.[26] And solicitation alone, which "involves no more than asking or enticing someone to commit a crime," does not constitute the crime of attempt.[27]

To convict Dechant of the crime of attempted murder in the first degree, the State had to prove that he did an act "which is a substantial step toward the commission of that crime."[28] "[C]onduct is not a substantial step 'unless it is strongly corroborative of the actor's criminal purpose.'"[29]

Finally, to prove conspiracy, the State had to establish that with the intent to commit a crime, Dechant agreed with one or more persons to engage in or cause the performance of such conduct and any member of the conspiracy took

---

[25] Borrero, 161 Wn.2d at 538-39.
[26] RCW 9A.28.030(1); State v. Jensen, 164 Wn.2d 943, 949, 195 P.3d 512 (2008).
[27] State v. Gay, 4 Wn. App. 834, 839-40, 486 P.2d 341 (1971).
[28] RCW 9A.28.020(1).
[29] State v. Workman, 90 Wn.2d 443, 451, 584 P.2d 382 (1978) (quoting MODEL PENAL CODE § 5.01(2)).

a substantial step in pursuance of the agreement.[30] The substantial step in this context merely serves to demonstrate an active agreement; it does not, as with an attempt, have to corroborate criminal intent.[31] Thus, "the conspiracy statute requires a lesser act than does the attempt statute."[32] The "preparatory conduct which furthers the ability of the conspirators to carry out the agreement can be 'a substantial step in pursuance of [the] agreement.'"[33]

Dechant argues that the evidence required to prove conspiracy was the same evidence required to prove the substantial step of the attempted murder. We disagree. As noted, a double jeopardy issue arises only if the same evidence used to prove the crime of conspiracy was necessary to prove the substantial step of the attempted murder.[34] When Dechant's accomplices drove toward Didomenici's residence armed with a firearm, they took a substantial step toward the commission of murder in the first degree. However, the jury did not need this evidence to find Dechant guilty of conspiracy. Other evidence established Dechant's agreement with Rogers and Scheulke and that the conspirators took action in furtherance of the agreement. For instance, the jury heard evidence that Dechant provided maps to Rogers and arranged for an

---

[30] RCW 9A.28.040(1).
[31] State v. Dent, 123 Wn.2d 467, 475, 869 P.2d 392 (1994).
[32] Dent, 123 Wn.2d at 477.
[33] Dent, 123 Wn.2d at 477 (alteration in original) (quoting RCW 9A.28.040(1)).
[34] See Borrero, 161 Wn.2d at 538-39.

outside contact to assist him in carrying out the plan. Dechant had contact with Scheulke, by telephone and in person, to secure his assistance. He wrote letters to Scheulke with further instructions. Scheulke also took a substantial step in furtherance of the agreement when he met with Rogers and supplied him with a firearm and money. The evidence establishing the conspiracy was not the only evidence constituting the substantial step element of attempted murder. Therefore, no double jeopardy violation occurred.

Dechant also contends that double jeopardy bars his conviction of solicitation to commit murder because solicitation is merely a lesser included offense of attempted murder. Therefore, he argues that these two convictions should merge. In instances where the degree of one offense is elevated by conduct constituting a separate offense, "the merger doctrine may help determine legislative intent."[35] This doctrine, however, applies "only when a crime is elevated to a higher degree by proof of another crime proscribed elsewhere in the criminal code."[36] Here, proof that Dechant committed solicitation to commit murder did not elevate the crime of attempted murder to a higher degree. Accordingly, the merger doctrine does not apply.

Dechant's convictions of conspiracy to commit murder in the first degree and attempted murder in the first degree do not violate the prohibition against

---

[35] State v. Kier, 164 Wn.2d 798, 804, 194 P.3d 212 (2008).
[36] State v. Parmelee, 108 Wn. App. 702, 710, 32 P.3d 1029 (2001).

double jeopardy. Nor did the trial court err by declining to apply the doctrine of merger to his convictions of solicitation to commit first degree murder and attempted murder.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Dechant claims his trial counsel provided ineffective assistance because he did not file a motion to suppress the evidence seized during his January 2013 arrest.

A defendant making this claim has the burden of establishing that (1) counsel's performance was deficient and (2) counsel's deficient performance prejudiced the defendant's case.[37] The claim fails if a defendant does not establish either prong.[38] Counsel's performance is deficient if it falls below an objective standard of reasonableness.[39] Our scrutiny of counsel's performance is highly deferential, and we strongly presume reasonableness.[40] When an ineffective assistance of counsel claim is based on a failure to move to suppress evidence, the defendant must show that the motion to suppress would have been granted.[41]

---

[37] Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).
[38] Strickland, 466 U.S. at 700.
[39] State v. McFarland, 127 Wn.2d 322, 334, 899 P.2d 1251 (1995).
[40] McFarland, 127 Wn.2d at 335.
[41] McFarland, 127 Wn.2d at 333-34.

Dechant claims that counsel should have moved to suppress evidence because the police searched the BMW without valid consent. He argues that his "borrowed car agreement" with Didomenici gave him the exclusive right to consent to a search. He asserts that neither consent from Didomenici or the registered owner supplied lawful authority to search. Although some testimony suggests an agreement about Dechant's temporary use of the vehicle, the record contains no evidence about the terms of that agreement. Dechant points to Scheulke's testimony that he thought the vehicle might represent payment for a drug debt. But Dechant told the police that he could not consent to the search because he was not the legal owner and provided Didomenici's telephone number. Dechant fails to show that his motion to suppress would have been granted. Moreover, not asserting ownership in the vehicle and thereby distancing Dechant from the contraband in the vehicle was a reasonable strategy under the circumstances.

## STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

In a statement of additional grounds, Dechant makes several claims, none of which has merit. First, he claims the court failed to investigate possible juror misconduct and improperly instructed the jurors.

After a lunch break during the trial, before the jury entered the courtroom, defense counsel informed the court that some witnesses had been "in the area"

where the jury was "congregating." Defense counsel directed the witnesses away from that area but suggested that the court might instruct witnesses about where to wait outside the courtroom. Instead, the court requested that the prosecutor have the State's witnesses wait further down the hall. After the jury reentered the courtroom, the court reminded the jurors that the attorneys did not wish to be impolite but were not allowed to communicate with them. The court instructed the jurors not to attempt to talk with the attorneys and that if they had questions about the case, to ask someone else.

This record does not show any communication or contact between witnesses and jurors or any other impropriety requiring court investigation. And with regard to the trial court's instruction, Dechant fails to show that the court's explanation of the rules governing contact between the lawyers and jurors was incorrect or in any way prejudicial.[42]

Next, Dechant challenges the court's admission of his recorded custodial statements to a police detective. He claims that his statements were inadmissible because the police officers failed to state on the record at the outset of the interview that they were recording the interview and the State failed to prove that he consented to the recording as required by the Washington privacy act, RCW 9.73.090(b).

---

[42] See RPC 3.5(b) (to preserve impartiality, ethical rules require attorneys to avoid ex parte communication with jurors during a proceeding).

The trial court concluded that law enforcement properly advised Dechant and he knew that the interview was being recorded. The interview room had clear signage indicating that conversations were not private, and the room was equipped with video and audio recording technology. The officers advised Dechant of his constitutional rights and discussed, in his presence, if they needed to use a backup recorder. At another point during the interview, one of the officers reminded Dechant that the interview was being recorded. Toward the end of the interview, Dechant told the officers he would talk to them if they ceased recording.

State v. Jones[43] supports this conclusion. Jones, a juvenile from Canada, claimed that the trial court should have suppressed his postarrest statement because the tape did not begin with the officer informing him that the statement was being recorded, a violation of RCW 9.73.090(1)(b)(i).[44] The court addressed whether the technical violation of RCW 9.73.090(1)(b)(i) required suppression when it was clear that Jones knew his statement was being recorded. The tape recorder was in plain view, and an officer explained on the tape that he was in the middle of a recording and started a question with "'for purposes of this tape.'"[45] The court held that "the tape recording conforms with the statute and is

---

[43] 95 Wn.2d 616, 628 P.2d 472 (1981)
[44] Jones, 95 Wn.2d at 619.
[45] Jones, 95 Wn.2d at 626-27.

-17-

therefore admissible."[46] Likewise here, the trial court did not err by refusing to suppress Dechant's tape-recorded statement on the grounds that the tape recording did not comply with RCW 9.73.090(1)(b)(i).

Finally, Dechant argues that his counsel provided ineffective assistance because he did not ask the court to suppress his statements to Rogers under Massiah v. United States.[47] He claims this case requires suppression because Rogers was a government agent and because some of his statements pertained to the pending drug and firearm charges. We disagree.

Once the State charges a defendant with a crime, it may not knowingly circumvent his Sixth Amendment right to counsel by using an undisclosed state agent to deliberately elicit an incriminating statement.[48] The State violates a defendant's right to counsel when it uses evidence against the defendant that it deliberately elicited while his attorney was not present.[49] The Sixth Amendment right to counsel is offense-specific and cannot be invoked for all future prosecutions.[50]

---

[46] Jones, 95 Wn.2d at 627.
[47] 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L .Ed. 2d 246 (1964)
[48] Maine v. Moulton, 474 U.S. 159, 176, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985).
[49] Fairbank v. Ayers, 650 F.3d 1243, 1255 (9th Cir. 2011) (citing Massiah, 377 U.S. at 206).
[50] United States v. Hines, 963 F.2d 255, 257 (9th Cir. 1992) (citing McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991)).

Nothing in the record suggests that the State deliberately elicited, through Rogers, any statements about his pending charges. According to Rogers and the detective who conducted the investigation, Rogers' instructions were only to ask about the plan to kill Didomenici. Because Dechant does not establish a Sixth Amendment violation, he cannot show that a motion brought on this ground would have been successful. His ineffective assistance of counsel claim fails.

Affirmed.

Leach, J.

WE CONCUR: