# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>MATHEW JOHN JAGGER,<br><br>Appellant. | No. 85037-7-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — Mathew Jagger appeals his conviction, arguing the State presented insufficient evidence he had the intent to commit and took a substantial step towards committing second degree rape of a child. We hold that the evidence was sufficient under the current "substantial step" standard to establish attempt, and that a former standard used to define the elements of attempt is not applicable to the attempted second degree rape of a child charge advanced here based on the "substantial step" standard. Jagger additionally argues the trial court erred in finding he waived his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), admitting Jagger's statements in violation of the corpus delicti rule, finding Jagger used a peremptory challenge in violation of Batson v. Kentucky, 476 U.S. 79, 88-89, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and imposing the victim penalty assessment. Except as to the victim penalty assessment, these arguments lack merit. We affirm Jagger's conviction and remand to strike the victim penalty assessment.

I

In 2021, Lynnwood police officer Christopher Breault worked in the special operations section conducting internet related investigations. Posing as a 13 year old girl named "Sara," Officer Breault created a Facebook profile to "start investigations on communications, specifically for communications for immoral purposes." In May 2021, "Sara" received a friend request from a profile labeled "Mat Jagger." On May 7, 2021, Jagger sent a Facebook message to "Sara." "Sara" replied on June 18, 2021.

["Sara":] hi

[Jagger:] Hay beautiful how are you doing hun
??

["Sara":] I am ok and u

[Jagger:] I'm ok to just really bored

["Sara":] That's no good

[Jagger:] I know hun and I didn't have anything to do Sunday around 11:45am and I don't know what to do when being bored again hun

["Sara":] I got ya
Not sure what I am up to

[Jagger:] Would you like to meet up on Sunday around 11:45 am hun

The following day, Jagger sent "Sara" his cell phone number. "Sara" sent Jagger a text message and the two began communicating regularly to make arrangements to meet. During their conversations, Jagger sent "Sara" two photos of himself,

2

which Officer Breault used to identify the sender as Jagger.  After a few days of

texting, "Sara" told Jagger her age:

> ["Sara":] Can I tel u a secret
>
> [Jagger:] Yes hun
> Yes you can hun
> ??? 🤔
>
> ["Sara":] Like I told u I like older guys and u are really good looking
>
> [Jagger:] Yes I know hun
>
> ["Sara":] I just want to let U know I'm 13 but still want to hang out with u do all that stuff.  I just want make sure your good wit that
>
> [Jagger:] Yes I am hun 😘

The next day, Jagger messaged "Sara":

> [Jagger:] If you were able to run away with me right now would you hun
> ???
> Yes or no
>
> ["Sara":] Where wuld we go
> What about your gfriend
>
> [Jagger:] Any where we want to
> You are my girlfriend now hun
> Does your mom and sister know that you like to be with older men
>
> ["Sara":] No
>
> [Jagger:] Just wondering
>
> ["Sara":] What shuld I tel them about running away with u
>
> [Jagger:] Nothing if you want
>
> ["Sara":] Do u think that's best babe
>
> [Jagger:] No I think that they would call the cops and say that I kidnapped you and I'm raping you

3

Because of my age
I think that we should when you are 17 or 18 years old

"Sara" asked more about Jagger's girlfriend:

["Sara":] How long have you 2 been together

[Jagger:] About a year
And she knew how old you are to

["Sara":] Wht did she say

[Jagger:] She said as long as that it what she wants
That we can be together

["Sara":] Does she knw everything

[Jagger:] Yes hun
And she doesn't care if we are together in a relationship
Is that ok with you hun

["Sara":] Will u still date her

[Jagger:] I'm with you but I will still be with her tell you turn 18 but we are in a relationship and she understands that we have to wait untilyou are 18 to Move out with me

The two made plans to meet at the mall and discussed what they should do together:

[Jagger:] Would you like to have sex with me in the back of my van hun??
If not that's ok

["Sara":] I wuld

[Jagger:] We can do that if you want to

["Sara":] K can u bring a condom and then we can talk about using it or not.
I just a little nervous 😬. . . .

[Jagger:] K
I know hun

4

After discussion back and forth about Jagger's suggestion of meeting at a coffee shop, Jagger confirmed where the two should meet:

[Jagger:] So where do you want to meet me tomorrow hun

. . . .

["Sara":] I have to get something at Kohl's so I will be there do u want to meet in the pking lot

[Jagger:] Where at in the parking
??

["Sara":] Near the front doors

On July 7, 2021, Sergeant Michael Atwood arrived at the parking lot where Jagger's vehicle was seen, and parked between the Kohl's entrance and Jagger's vehicle. As Jagger walked towards the Kohl's entrance, Sergeant Atwood arrested him and retrieved his cell phone. Jagger consented to a search of his van, where officers found a brown paper bag containing condoms.

A jury found Jagger guilty of attempted second degree rape of a child and communication with a minor for immoral purposes via electronic communications. Jagger appeals.

II

Jagger argues the State presented insufficient evidence he had the intent to commit and took a substantial step towards committing second degree rape of a child. We disagree.

Due process requires the State to prove beyond a reasonable doubt every element of a crime. State v. Rodriquez, 187 Wn. App. 922, 930, 352 P.3d 200 (2015). In reviewing a claim for insufficient evidence, we consider " 'whether, after

5

viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime *beyond a reasonable doubt.*' " State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (emphasis added) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)), overruled on other grounds by Washington v. Recuenco, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006). In a sufficiency of the evidence claim, the defendant admits the truth of the State's evidence and all inferences that reasonably can be drawn from that evidence. State v. Colquitt, 133 Wn. App. 789, 796, 137 P.3d 892 (2006). The sufficiency of the evidence is a question of constitutional law that we review de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

Attempt consists of two elements: intent and a substantial step. State v. Aumick, 126 Wn.2d 422, 429, 894 P.2d 1325 (1995). To convict Jagger of attempted second degree rape of a child, the State had to prove beyond a reasonable doubt that Jagger intended to have sexual intercourse and took a substantial step toward having sexual intercourse with a child under the age of 14.[1] RCW 9A.44.076(1); RCW 9A.28.020. A "substantial step" is an act that is " 'strongly corroborative' " of the actor's criminal purpose. State v. Johnson, 173 Wn.2d 895, 899, 270 P.3d 591 (2012) (quoting State v. Luther, 157 Wn.2d 63 78, 134 P.3d 205 (2006)). Mere preparation to commit a crime is not a substantial step. State v. Townsend, 147 Wn.2d 666, 679, 57 P.3d 255 (2002). But "[a]ny

---

[1] The State also had to prove that Jagger was at least 36 months older than the other person. RCW 9A.44.076(1). Jagger does not challenge on appeal that there was sufficient evidence he was at least 36 months older than age 13.

slight act done in furtherance of a crime constitutes an attempt if it clearly shows the design of the individual to commit the crime." State v. Price, 103 Wn. App. 845, 852, 14 P.3d 841 (2000).

Jagger engaged in sexually explicit messaging with a person claiming to be a 13 year old girl and arranged to have sex with her in the back of his van. The content of their messaging over the two months preceding Jagger's arrest included his encouraging "Sara" to keep their relationship secret from her family, his suggesting clandestine meetings, his stating they were already "in a relationship," his soliciting a long term relationship in place of his existing relationship with his girlfriend, his acknowledgement that others could accuse him of "raping" her because of his "age," and his express inquiry about whether the supposed 13 year old wished to have sex. Viewed in the light most favorable to the State, these are individually somewhat suggestive of intent to have a sexual relationship, and taken together are clearly so. Jagger drove to the agreed upon meeting place in his van and began walking towards Kohl's before he was apprehended. Consistent with "Sara's" request, Jagger had condoms in his vehicle. Viewing the evidence in the light most favorable to the State, the jury could find beyond a reasonable doubt that Jagger intended to have sexual intercourse with a 13 year old and took a substantial step toward the commission of the crime of second degree rape of a child.

Jagger relies on State v. Grundy, 76 Wn. App. 335, 336, 886 P.2d 208 (1994), to argue his actions did not amount to a substantial step. Grundy held negotiation about purchasing cocaine did not progress far enough to support a

7

conviction for attempted possession. Id. at 337. Grundy was decided under a different statutory definition for attempt. Under an earlier statute, former RCW 9.01.070 (1909), now repealed, the elements of attempt were intent and an act " 'tending but failing to accomplish' " the crime, also referred to as an overt act. State v. Gay, 4 Wn. App. 834, 838-39, 841, 486 P.2d 341 (1971). An "overt act" meant a "direct, ineffectual act done towards commission of a crime, and, where the design of a person to commit a crime is clearly shown, slight acts done in furtherance of this design will constitute an attempt." State v. Nicholson, 77 Wn.2d 415, 420, 463 P.2d 633 (1969). In 1975, the legislature adopted the "substantial step" language of our current statute. LAWS OF 1975, 1st Ex. Sess., ch. 260, § 9A.28.020 (adopting the language currently in RCW 9A.28.020). "The standard of a substantial step will not be identical to the standard of an overt act." State v. Workman, 90 Wn.2d 443, 451, 584 P.2d 382 (1978). Instead, the definition of substantial step "which is the same as that employed by the Model Penal Code, normally 'will broaden the scope of attempt liability.' " State v. Jackson, 62 Wn. App. 53, 56, 813 P.2d 156 (1991) (quoting Model Penal Code § 5.01 cmt. 6(a), at 329 (1985)). Because it is based on a different standard defining attempt, in addition to its being distinguishable, Grundy is not applicable to the charge of attempted second degree rape of a child advanced against Jagger based on the "substantial step" standard.

Courts rejected sufficiency challenges in cases similar to this one in Townsend, State v. Wilson, 158 Wn. App. 305, 318, 242 P.3d 19 (2010), and State v. Sivins, 138 Wn. App. 52, 64, 155 P.3d 982 (2007). In Townsend, the court

8

concluded the defendant's Internet messages to someone he thought was a 13 year old girl and his going to an arranged meeting at a motel room to have sex were sufficiently corroborative of his intent to have sexual intercourse with a child. 147 Wn.2d at 670-71, 680.  In Wilson, Wilson engaged in an e-mail exchange with "Jackie" and arranged to have " 'oral and full sex' " with a supposed 13 year old girl.  158 Wn. App. at 317.  After agreeing on a price, Wilson exchanged photographs with "Jackie," obtained "Jackie's" address, and drove to the agreed upon meeting place with the $300 he agreed to pay, all of which sufficiently corroborated his intent to commit the crime of second degree rape of a child.  Id. at 318.  In Sivins, the evidence was sufficient to convict the defendant of attempted second degree rape of a child where the defendant engaged in sexual communications with a person whom he believed to be 13 years old, stated he wanted to meet the girl and would have sex with her, and drove several hours and rented a motel room in her hometown.  138 Wn. App. at 64.

The same circumstances supporting sufficiency are evidenced here. Jagger engaged in messaged conversation with "Sara," discussed intent to have sex expressly, agreed on a meeting place, and Jagger went there as planned.  The evidence is sufficient to support a determination that Jagger intended to have sexual intercourse with a 13 year old girl and that he took a substantial step toward committing second degree rape of a child.

III

Jagger argues the trial court erred in finding he made a knowing, intelligent, and voluntary waiver of his right to remain silent, claiming he lacked the capacity to waive his right. We disagree.

A

The trial court conducted a CrR 3.5 hearing to determine the admissibility of Jagger's statements to police officers.

Officer Breault testified he advised Jagger of his <u>Miranda</u> rights using a department issued card, and thought Jagger said he understood his rights. Officer Breault testified that Jagger "shook his head" in an affirmative yes when asked if he understood. Jagger told Officer Breault that he wanted to speak to the officer away from everyone else. After moving away from the other officers, Officer Breault and Jagger engaged in a conversation centered around Jagger and his explanations of what happened and justification for why he was at Kohl's. Officer Breault testified, "It was clear to me that he understood what was going on, but the information when we were having a conversation was a lot of justifying or coming up with information to say why he was there."

Detective George Bucholtz testified regarding his interview with Jagger. After Jagger was transported to the Lynnwood police department, Detective Bucholtz and Detective Russ Sattarov took Jagger to an interview room and removed his handcuffs. Detective Bucholtz read Jagger his <u>Miranda</u> rights from a preprinted sheet, which mirrored the department issued card. Detective Bucholtz testified that Jagger indicated he understood his rights and wanted to speak with

10

detectives. Detective Bucholtz testified Jagger appeared to understand the questions, but "he was being evasive in his answers."

Dr. Robert Beattey, an expert in forensic psychology, testified on Jagger's behalf and opined that Jagger was unable to make a knowing, intelligent, and voluntary waiver of his Miranda rights due to his limited intellectual capacity. Dr. Beattey testified Jagger "has okay verbal comprehension, but his processing speed and working memory are significantly impaired" and "his ability to take in verbal information and then use it for decision-making is substantially impaired." During his interview with Dr. Beattey, Jagger stated he did not request to speak with an attorney because he did not think he did anything wrong. Jagger told Dr. Beattey, " 'I've heard [Miranda warnings] said different ways, I kind of blur it out. There's no point in listening to them.' " Dr. Beattey testified Jagger likely heard the words as a blur because he lacked the ability to process information as quickly as he could read information.

The trial court found Dr. Beattey "credible in relation to what his determinations were in this case," but

> [w]hile Dr. Beatt[e]y concludes that testing reveals that the information was likely a blur because he lacked capacity to process any verbal information as quickly as the warnings were in the case, the Court does not find this persuasive based on [Jagger's] response to other questions of Dr. Beatt[e]y surrounding Miranda, his immediate indication when advised why he was arrested to provide an explanation for his behavior, his acknowledgment at the scene that he understood his rights, the questions and responses thereto in the recorded interview, his previous contacts with law enforcement, and Dr. Beatt[e]y's own caution that only a few tests he used in his assessment were specifically designed to be used in forensic context.

(Formatting added.) The trial court held that Jagger knowingly, intelligently, and voluntarily waived his Miranda rights when speaking to Officer Breault in the Kohl's parking lot and during his interview at the Lynnwood police department.

B

The right not to incriminate oneself arises from the Fifth Amendment to the United States Constitution, as well as Article I, section 9 of the Washington Constitution. State v. Radcliffe, 164 Wn.2d 900, 905, 194 P.3d 250 (2008). To protect this right, a suspect must receive Miranda warnings when facing custodial interrogation by a state agent. State v. Heritage, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). The State bears the burden to show that the suspect knowingly, intelligently, and voluntarily waived their Miranda rights. State v. Athan, 160 Wn.2d 354, 380, 158 P.3d 27 (2007). "A defendant's mental disability and use of drugs at the time of a confession are [factors to be] considered, but those factors do not necessarily render a confession involuntary." State v. Aten, 130 Wn.2d 640, 664, 927 P.2d 210 (1996). Rather, courts look to the totality of the circumstances to determine whether a confession is voluntary. Id. at 663-64.

The trial court issued findings of fact and conclusions of law in its order denying Jagger's motion to suppress. We review the trial court's findings of fact for substantial evidence. State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Evidence is substantial if the record contains a sufficient quantity of evidence to persuade a fair-minded, rational person of the truth of the assertion. State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). The trial court's legal

conclusions regarding the adequacy of the Miranda warnings are issues of law that we review de novo. State v. Mayer, 184 Wn.2d 548, 555, 362 P.3d 745 (2015).

Officer Breault testified Jagger "shook his head" in an affirmative yes when asked if he understood his rights, and requested to speak to Officer Breault away from others to explain what happened and justify why he was in the Kohl's parking lot. Similarly, Detective Bucholtz testified Jagger stated he understood his rights and wanted to speak with the detective. See State v. Cushing, 68 Wn. App. 388, 394-95, 842 P.2d 1035 (1993) (a trial court may consider a defendant's demeanor, comprehension of events, memory of the crime, and participation in the interview as evidence of voluntariness). Though Dr. Beattey testified Jagger's capacity to waive his Miranda rights was substantially impaired, the trial court found his testimony unpersuasive. A trial court's factual findings arising out of contradictory testimony are entitled to great weight, even where fundamental constitutional rights are implicated. State v. Davis, 34 Wn. App. 546, 552, 662 P.2d 78 (1983). Substantial evidence supports the trial court's findings that Jagger's statements were voluntarily made. The trial court did not err in finding Jagger's statements admissible.

IV

Jagger argues the trial court erred by admitting his statements to the police in violation of the corpus delicti rule. We disagree.

"Corpus delicti" means the "body of the crime" and requires the State to prove both a criminal act and a resulting injury or loss. See Aten, 130 Wn.2d at 655. Attempt crimes do not require a showing of injury or loss. State v. Smith,

13

115 Wn.2d 775, 781, 801 P.2d 975 (1990). Our review is de novo. State v. Green, 182 Wn. App. 133, 143, 328 P.3d 988 (2014).

Jagger's argument assumes the incriminating statements he made to "Sara" were confessions. However, the statements constituted part of the crime. We have refused to apply the corpus delicti rule to exclude statements made before or during the commission of a crime. See State v. Dyson, 91 Wn. App. 761, 763-64, 959 P.2d 1138 (1988); see also State v. Pietrzak, 110 Wn. App. 670, 681-82, 41 P.3d 1240 (2002). In Dyson, we rejected the argument that the defendant's statements covering negotiation and agreement for an act of prostitution were inadmissible because they were not corroborated by independent proof. 91 Wn. App. at 763. The court defined "confession" as an "expression of guilt as to a past act" and held the corpus delicti rule did not apply because Dyson's statements were "made as part of the crime itself," and were not a confession to a completed crime. Id. at 763-64. In Pietrzak, the State presented evidence that Pietrzak told people he disliked the victim and wanted to kill her. 110 Wn. App. at 675-76. After Pietrzak made these statements, the victim disappeared. Id. at 672, 675. We held Pietrzak's incriminating statements made before the crime were not confessions and therefore did not require independent corroboration. Id. at 680-81.

Jagger's statements to "Sara" were part of the crimes of attempted second degree rape of a child and communication with a minor for immoral purposes via electronic communications. The corpus delicti rule does not apply.

14

V

Jagger argues the trial court erred in finding he committed a <u>Batson</u> violation when he used a peremptory challenge on juror 17. However, we do not decide whether the court erred in denying the peremptory challenge under <u>Batson</u>, because we conclude that any error was harmless.

The State objected to Jagger's peremptory challenge against juror 17 under <u>Batson</u>. The State said, "[T]he sixth peremptory is now the fifth woman to be challenged by Defense Counsel" and the State believed it had a "duty to raise it given that it appears that women are being struck primarily." Jagger stated he challenged juror 17 because

> [s]he gave very kind of vanilla answers to questions; we couldn't get a good read on her. Being unable to get a good read on a juror and the client feeling uncomfortable with that juror is enough that we felt another woman could take her place in the box. Gender was not a part of our analysis.

The trial court asked for further elaboration on the answers of juror 17 that Jagger disliked or did not feel comfortable with. Jagger stated,

> I thought her answers were very vanilla, kind of standard, sure, I'll do whatever the law is, and that always makes one kind of nervous because especially after the bias presentation, a lot of jurors are very candid about having been thoughtful about this, so even if they come to a place where they can be fair, there is some nuance and thought to it.
>
> I didn't get that depth at all from 17 when I was questioning. She answered burden questions from the State in a way that suggested that she would comply with the law, felt it was very important if someone wanted to follow the law, very important to take them [in]to account. They came across like the standard Law and Order kind of law enforcement answers.
>
> She is involved in real estate and seemed to come from a very different place, seemed to come from a place of privileged place in society. She was dressed to the nines, her hair immaculately done.

> She had a handbag that looked like it was quite expensive. It was my impression that some facts of our case might not be well received by someone so removed from poverty, particularly with pictures of the van and the fact that [Jagger] was homeless and living in his van I felt like would make him very unrelatable in a way that would hurt her reception of our case.

The trial court sustained the objection. The trial court rejected Jagger's gender neutral explanation, stating, "I don't know that I can extend reliance on conduct or appearance . . . to satisfy a gender-neutral reason in this case," indicating it did not believe the explanation supported a peremptory challenge. It is clear the trial court did not believe the observed circumstances of jury selection supported the reasons given, implicating the principle that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995). Jagger did not challenge juror 17 for cause, and juror 17 was seated on the jury.

In Rivera v. Illinois, the United States Supreme Court held that "[i]f a defendant is tried before a qualified jury composed of individuals not challengeable for cause, the loss of a peremptory challenge due to a state court's good-faith error is not a matter of federal constitutional concern." 556 U.S. 148, 157, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009). In Washington, because "there is no right to a peremptory challenge under either the United States Constitution or the Washington Constitution, . . . the erroneous loss of a peremptory challenge does not undermine the fundamental judicial process," and therefore does not constitute per se reversible error. State v. Booth, 22 Wn. App. 2d 565, 581-82, 510 P.3d 1025 (2022). Rather, we analyze the erroneous denial of a peremptory challenge under the nonconstitutional harmless error standard. Id. at 584. Under this

16

standard, an "error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected." State v. Cunningham, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980).

Jagger argues juror 17's presence on the jury materially affected the outcome of trial because her answers indicated a "lack of thoughtfulness" about the jury's role. However, Jagger's claim is based on speculation. Juror 17 agreed she could follow the law even if she disagreed with the law given to her, and stated she would not automatically find for the State if the defense did not put on evidence because "[i]t's still all evidence. You have to look at it to see if it is without a reasonable doubt. If there's any doubt, you can't really do much with that. I think which party provides it isn't as important." There was no basis on which to challenge juror 17 for cause and Jagger did not attempt to make such a challenge. "A juror who was not subject to a for-cause challenge is necessarily competent and unbiased." State v. Hillman, 24 Wn. App. 2d 185, 195, 519 P.3d 593 (2022). "[E]ven if the defense can show they should have been allowed their peremptory strike, this is not the type of error that undermines the validity of the final verdict or that warrants reversal of the final judgment." Id. Because Jagger does not show that juror 17's presence on the jury materially affected the outcome of the trial, any error in sustaining the Batson challenge was harmless. Jagger's inability to meet the harmless error standard under Booth and Hillman ends the analysis of his claim of error in the trial court's Batson ruling.

VI

Jagger argues the trial court erroneously imposed the victim penalty assessment. The State concedes remand is appropriate to strike the fee. We accept the State's concession, and remand accordingly.

We affirm Jagger's conviction and remand for the trial court to strike the victim penalty assessment.

_____
Birk, J.

WE CONCUR:

_____     _____
Feldman, J.                          Brennan, J.

*State v. Jagger*, No. 85037-7-I

FELDMAN, J. (concurring) — While I agree with the majority's reasoning and holding, I write separately to identify an alternative to the majority's application of harmless error review to the trial court's denial of Jagger's peremptory strike. Numerous courts have instead applied a rule requiring per se reversal where a trial court erroneously denies a peremptory juror challenge and the objectionable juror deliberated. Because harmless error review is the prevailing rule in the Washington Court of Appeals, I concur on that point. But both rules—harmless error review and per se reversal—have distinct advantages and strong support. Which rule should govern in Washington courts is an issue of substantial public interest that ultimately should be determined by our Supreme Court.

Our Supreme Court addressed these competing rules in *State v. Vreen*, 143 Wn.2d 923, 26 P.3d 236 (2001). The trial court in *Vreen* erroneously denied a peremptory juror challenge and the objectionable juror deliberated. *Id.* at 927. Division three of our court held that denial of the peremptory strike was erroneous and per se reversible. *Id.* at 927. Our Supreme Court granted review and affirmed. *Id.* at 927, 932. Rejecting the State's argument that the court should abandon its per se reversal rule because it predated the development of harmless error review, the court concluded that harmless error review is unworkable where a trial court erroneously allows a juror to sit despite an attempted peremptory challenge. *Id.* at 930-31. The court explained: "short of taping jury deliberations, there is no way of knowing exactly how the error affected the outcome, if at all." *Id.* at 931. The

court thus held that "erroneous denial of a litigant's peremptory challenge cannot be harmless when the objectionable juror actually deliberates." *Id.* at 932.

Applying federal law, in contrast, the U.S. Supreme Court has rejected the argument that the "deprivation of a state-provided peremptory challenge requires reversal as a matter of federal law." *Rivera v. Illinois*, 556 U.S. 148, 160, 129 S. Ct. 1446 (2009). The Court in *Rivera* explained that the United States Constitution does not guarantee peremptory challenges, so "the loss of a peremptory challenge due to a state court's good-faith error is not a matter of federal constitutional concern." *Id.* at 157. But the Court also emphasized that peremptory challenges are "a creature of statute" and that states therefore "retain discretion to design and implement their own systems." *Id.* at 157-58 (quoting *Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S. Ct. 2273 (1988)). Emphasizing the point, the Court added: "States are free to decide, *as a matter of state law*, that a trial court's mistaken denial of a peremptory challenge is reversible error *per se.*" *Id.* at 162 (first emphasis added).

Because *Rivera* is not controlling in cases where the right to a peremptory challenge is established by state law, state courts have diverged in the wake of *Rivera*. According to the Michigan Supreme Court, a majority of states have adopted harmless error analysis, as the U.S. Supreme Court did in *Rivera*. *People v. Yarbrough*, 511 Mich. 252, 284 n.33 (2023) (quoting *People v. Roldan*, 353 P.3d 387, 395-96 (Colo. App. 2011)) (Bernard, J. concurring)) (noting that "at least twenty-nine states and the United States do not employ the remedy of automatic reversal, but, instead, require a defendant to show prejudice—namely, that a biased juror actually sat on the jury—in order to gain appellate relief"). Our court

2

did so in *State v. Booth*, 22 Wn. App. 2d 565, 583, 510 P.3d 1025 (2022). The *Booth* court noted that *Vreen* relied heavily on federal cases, most notably *United States v. Annigoni*, 96 F.3d 1132 (9th Cir. 1996) (en banc)), which were "unanimously abrogated" in *Rivera*. *Id.* The court then held, "we analyze the error using the nonconstitutional harmless error standard." *Id.* at 584. Division three of our court adopted a similar rule in *State v. Hillman*, 24 Wn. App. 2d 185, 519 P.3d 593 (2022), and division two followed in *State v. Hale*, 28 Wn. App. 2d 619, 537 P.3d 707 (2023).

But many other state courts have maintained a per se reversal rule in the wake of *Rivera*. For example, the Michigan Supreme Court observed in *Yarbrough* that the statutory right to peremptory challenges "would be virtually immunized from appellate protection by the application of the harmless-error standard" and therefore held "that automatic reversal is the appropriate remedy for the erroneous denial of a defendant's peremptory challenge when the error is preserved and no curative action is taken." 511 Mich. at 268. In *State v. Mootz*, 808 N.W.2d 207, 225 (Iowa 2012), the Iowa Supreme Court echoed our Supreme Court's recognition in *Vreen* that the erroneous denial of a peremptory strike "is not amenable to harmless error analysis because of the difficulty in showing actual prejudice." *Id.* The court also observed that "[a]n automatic reversal rule will help ensure a district court will not deprive criminal defendants of their right to peremptory challenges." *Id.* at 226. It therefore retained the per se reversal rule. *Id.* In *People v. Hecker*, 15 N.Y.3d 625 (2010), the court similarly emphasized "[t]hough not a trial tool of constitutional magnitude, peremptory challenges are a

3

mainstay in a litigant's strategic arsenal" and a "privilege of the accused," which is protected by statute. *Id.* at 661 (quoting *People v. Luciano*, 10 N.Y.3d 499, 502 (2008)). Like the Iowa Supreme Court in *Mootz*, the court in *Hecker* expressly rejected the argument that state courts should adopt harmless error review merely because the U.S. Supreme Court did so in *Rivera*. *Id.* at 661-62; *Mootz*, 808 N.W.2d at 225-26. The court instead concluded, "we look to our precedents and hold that [a trial court's erroneous denial of a peremptory challenge] under New York law mandates automatic reversal." *Heckler*, 15 N.Y.3d at 661.

These competing rules—harmless error review and per se reversal—also have distinct advantages. In support of its holding, the court in *Booth* noted that harmless error review advances the goal of GR 37, which is "to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37 (a). The court explained that "parties and courts would be 'dissuaded' from bringing or granting GR 37 motions if we 'h[e]ld that a one-time, good-faith misapplication' of GR 37 automatically requires retrial." *Booth*, 22 Wn. App. 2d at 584 (citing *Rivera*, 556 U.S. at 160). The per se reversal rule, in contrast, recognizes the critical importance of peremptory challenges, which are guaranteed by RCW 4.44.130 and "allow[] the parties to 'eliminate those jurors perceived as harboring subtle biases with regard to the case, which were not elicited on voir dire or which do not establish legal cause for challenge.'" *Mootz*, 808 N.W.2d 225 (quoting *Commonwealth v. Hampton*, 928 N.E.2d 917, 927 (Mass. 2010) (citation and internal quotation marks omitted)). The per se reversal rule thus enhances both the actual and perceived fairness of a criminal proceeding by providing meaningful

4

relief to an accused where the trial court erroneously denied a peremptory juror challenge and the objectionable juror deliberated.  Whether to retain the per se reversal rule in the wake of *Rivera* is and remains an issue of substantial public interest that ultimately should be determined by our Supreme Court.

With these observations, I respectfully concur.

Feldman, J.